Bidot v. County of Suffolk Bidot v. County of Suffolk Discrimination and Retaliation Claims arising from the imposition of discipline against the plaintiff. The jury may find that defendants imposed disciplinary charges against the plaintiff in violation of Title VII for two reasons. First, the initial round of discipline from July and August of 2018 arose from sex orientation discrimination, and then they expanded upon the disciplinary charges against plaintiffs in November, a little more than two months after he brought an EEOC charge objecting to the national sex orientation discrimination. Now, I recognize that the arbitrator did find the plaintiff was guilty of certain acts of misconduct, but I also recognize that this Court holds that, in the Title VII context, adverse findings in an arbitration are not dispositive in a wrongful discharge claim if you can show special circumstances, and that would be the Broich case against Southampton, Dicencio, and Collins v. New York City Transit Authority. And so the argument we're making is that the plaintiff was singled out, because the charges that he was presented with for bad time records and not accounting for his time and theft of services seemed to be a common occurrence at the Suffolk County Department of Probation. What we know from the Acosta affidavit, Lisa Acosta's affidavit, and the testimony from Neubauer, and the Stanzion Declaration, is that there was a culture in the Department of other probation officers doing exactly what the plaintiff was found responsible for doing. So then we have— I get that idea that you could accept the findings of the arbitrator that he did the conduct, and if you could show that, well, he did do the conduct, but they don't bring—they don't dismiss people who do the same conduct who are outside the protected class, that would be discrimination, even if you take for granted the findings of the arbitrator. But the district court does say that the comparators are not civilly situated because they did not do the conduct as extensively. And it's true that the district court kind of thinks about that in terms of whether there's a problem with the— there's a bias in the arbitrator, and your argument is really the bias would be the employer. But aren't the same—isn't that conclusion—wouldn't that be a response to what you're saying, that if it's correct that the comparators are not civilly situated because they don't do the conduct to the same extent, he would not be able to show that the employer does, in fact, tolerate the same conduct in other people? That's an argument a defendant can make, but I think a jury could also find in response that generally what they found the plaintiff guilty of at the disciplinary hearing—and it was mostly the same acts over and over because if you keep doing it, you're going to do it until somebody stops you from doing it—everybody else seemed to be doing it. Lisa Acosta, a fellow probation officer, said she recalls making mistakes on dates, and sometimes she corrected them, sometimes she didn't correct them. She was never penalized for this, and she never recalled any other probation officers being penalized for making the same mistake. So that takes care of count one against the plaintiff with respect to— Mr. Bergstein, it's not just a matter of making mistakes about dates. I mean, granted, there are a lot of charges here, and maybe there are more than make sense, and maybe there are defenses for some of them. But some of the misconduct was saying that you made visits to probationers' homes when he did not. Okay. That's charge two. Okay. But isn't that a more significant matter than stopping off to say hi to mom while you're in a company car? Well, that's—stopping off to say hi to mom is really charge two, making side trips when you're on company time. But in both instances, the Acosta affidavit, which we take to be as true, is that people were doing this on a regular basis, and the plaintiff apparently was doing it on a regular basis also. Excuse me. Her testimony is that probation officers regularly recorded that they had made site visits to probationers' homes that they had not made? Acosta wrote, when I was out in the field, I went home to eat or use the bathroom. This was a common practice in the department. Right. That's the side trips. Excuse me. That's the side trips. That's—I called it stopping off to see mom. But there are a lot of things you could do. You could stop at the grocery and pick up some groceries. You could do various things that technically maybe you were prohibited from doing but that seem relatively innocuous. What I'm focused on is saying that you did your job when you did not as one of the charges. Is that something that any of the comparators were accused of? Or that Mrs. Acosta said she did? She said, I recall making mistakes on dates also. That's probably—that refers to the charge, charge number one against the plaintiff. And she didn't always correct it. She was never penalized. My point is, you know, the jury can decide if these are similarly situated, which often is an issue of fact under grammar as long as it's a railroad. They're not charging anybody else for this. And you assume that they don't—they shouldn't be tolerating any of this with respect to being in the wrong place or not having— Why did you make that assumption? I mean, might it not be that the employer was willing to tolerate some level of reporting mistakes or stealing of time, but that none of the comparators rose to the level of the severity which he was charged with? That just makes them not similarly situated. Well, that's an argument defendants would make at trial, that, you know, he was worse because he did it more often. But it sounds like, based on the evidence— No, because you're saying it's kind of a judgment call because you could see it as, you know, just sort of a matter of degree but not really different, and so it doesn't really require the conclusion that the employees were not similarly situated. That's what you're saying? Yes, because it looks like there was a culture in the department of lax compliance with the rules. And it sounds like this was happening on a regular basis. Our guy is charged, and then they amend the charges after he brings an EEOC complaint for doing things that other people are doing, and no one was ever charged. And, you know, apart from that, Stanzi owns Declaration, page 524 of the record, page 524, 525. She describes how another probation officer handled personal business during working hours, taking college courses when he was on company time. Nothing happened to that individual, no punishment. And then in deposition, Neubauer, the acting director, described a series of probation officers who were not terminated, even though they were engaging in all kinds of misconduct. One of them, Lowry, was forging documents, stealing company time. She was giving a soft landing. She could retire without penalty. And then there was five other POs, probation officers that were in our brief, who also engaged in misconduct, and nothing really happened to them, nothing like what happened to Bideau. And when Neubauer was asked at deposition, well, you know, you didn't give the plaintiff a chance to explain himself, unlike the other probation officers. Why is that? And she said, it didn't occur to me to ask him. So that's the most striking example to me is Neubauer's testimony about the female probation officer who forged documents and took sick leave, falsified her sick leave applications. That seems like a fairly serious thing. And she was at least allowed to serve out her time, in effect, until retirement. I don't know how close Bideau was to retirement. But if he had somewhere within striking distance, it's a little odd that the response is, well, I just didn't think of that in his case. But at the same time, the other question I want to ask you about is, it's not just was he treated differently. It's was he treated differently on the basis of a protected characteristic, which in this case is sexual orientation. Now, is the only evidence of anti-gay bias in the record that the officer, I'm blanking his name at the moment, Luther, who did the investigation, which is significant, that he gave what perhaps one could find was insincere congratulations on Officer Bideau's wedding? Is there any other evidence that anyone in the department mistreated or ostracized or did anything else toward that either that officer or anybody did anything that was reflective of anti-gay bias beyond that one remark? We're talking about Larson. Larson, yeah. In the summary judgment ruling, Larson shook his head no, and he smirked, and he said congratulations sort of in a sarcastic way. There's no other evidence, direct evidence of anti-gay bias, but Larson is the one who starts the investigation that results in the charges against Planeth. But the other theory of liability is that the charges were amended because the Planeth— Correct. They then added dozens more charges after he brought the EEOC charge, and it was shortly after two months that he brought the EEOC charge, so that brings us within the prima facie case. So— I mean, is that retaliation? I mean, if he's objecting to the charges and the employer responds by further substantiating their case, I mean, isn't it weird to kind of consider that retaliation? It's not like a separate act. It's within the same case. So isn't that what the employer is supposed to do, that if somebody says these are not founded charges, they produce evidence that they are founded charges? Well, that's an argument management could make at trial, I guess, but if you're bringing an EEOC charge and the first round of charges was discriminatory and then they almost doubled the number of charges two months later, you know, the argument is that they could have done this sooner. They didn't until he brings the EEOC charge, and that it's up to the jury to determine whether there was a retaliatory motive, which you don't have much of a burden of proof on the prima facie case to begin with when you're arguing retaliatory motive. Getting to the first part of your discrimination claim, you allege that a transfer was denied and the response was there was no position open, but at some point there was an opening in the district court. Was there any evidence presented that your client applied to the opening when it finally did come through? Well, the better argument on the transfer denial is that he sort of transferred to family court. This was in June 2018, and he was told, well, we need you. We can't use you there. We need you here because you speak Spanish, and that was Stitt. That was one of the defendants, and he testified there was an open position in family court. This was in June 2018, but Stitt did not take that up with Neubauer, but if there's an open position in family court, the assumption is that Neubauer would have known about it. The department is not that huge. She wouldn't know about vacancies. So, you know, that's really a national origin discrimination claim. But Stitt is not the one that makes the decision about the transfer, but you're saying Stitt could have recommended to the decision maker that they do the transfer, and so the discrimination is him not making that recommendation? He had influence, yes. He had influence over such a transfer because he said, I need approval from Neubauer, but he didn't bring it to Neubauer's attention. And why aren't there Spanish language skills? Why is that discrimination on the basis of national origin? Why isn't that just a qualification for a job? Like a bona fide qualification? They didn't actually make that defense, the BFOQ. No, excuse me. I don't think the question is about whether it's a BFOQ. It doesn't allow an inference of discrimination. Yeah, does it allow an inference of discrimination against people of Latin or Hispanic origin when the actual statement is Spanish speakers, you know, at least on the face of it. Now, I grant you you can argue that this might be a disputable thing, but on the face of it, if, you know, I had been myself in that position and I had majored in Spanish in college and had studied abroad in several Latin American countries and was fluent in Spanish, Stitt might have said the same thing. We need a Spanish speaker. He didn't say we need a Latino probation officer because people like you have greater empathy with criminals or something like that. He said we need people who can speak the language, and you fit that bill. Why does that constitute evidence of discriminatory treatment on the basis of national origin rather than on the basis of simple language skill? Well, Bidot is Latin. He's Latin. He's a Latin male. He knows Spanish. I don't think it's a stretch to argue to a jury that if you're denying somebody a transfer because you speak Spanish, and he does, that it's related to national origin. There is a national origin component to such a justification, enough that you could take it to a jury and let the jury decide. Let me ask you again, and I appreciate that you thought of a better question to answer yourself, but I still want you to answer my question. Other than the one time he asked for the transfer to family court, he was told there were no openings. Did he subsequently seek out and apply for any other positions? Is there any evidence of the record of that? The only answer I can give is that he made two transfer requests. One was to domestic violence, and one was to family court. I think those are the requests that we have in the record. They were both in the first half of 2018. That's the best answer I can give. But I think the stronger argument on the transfer denial is the family court, where the Spanish-speaking justification and the availability of the position in family court. Okay, thank you very much, Mr. Burstein. You've reserved time for rebuttal, so we'll hear from you again. But let's turn to the appellee, Mr. Schirmer. Good afternoon, Your Honors. May it please the Court, my name is Drew Schirmer with Suffolk County. I guess we'll pick up about the transfer requests. There were two requests made to Neubauer by e-mail. When she advised Bedell that she would look into its availability and responded fairly quickly that there were no available positions and that in the future she would consider any transfer requests. Just Mr. Burstein doesn't know, but subsequent to his return from his suspension once the charges were levied against him, he was transferred to another unit. It's a little bit academic then because they're trying to kick him out at that point. Right, right. But I mean, he was the only Spanish-speaking probation officer in the sex offender unit. So, yes, there was a need. He had many Spanish-speaking probationers that he was responsible for, many of whom whose homes he was in. Your position is that Spanish-speaking is a skill and you can't infer from the idea that somebody says we need Spanish speakers that it's national origin discrimination. Do you take that position? Excuse me, Your Honor? Your position would be that somebody saying we need Spanish speakers doesn't allow an inference of discrimination because that is just a modified need in the unit.  Basically, it was we need you. You're a Spanish speaker because you're the only one that speaks Spanish in this unit and you have many probationers that you're in charge of. It's basically academic.  So you're saying that otherwise he has a plausible claim you're saying there's no inference of discrimination. But what about what Mr. So maybe you're saying that this doesn't matter, but Mr. Bergstein suggested that we can tell from the record that there was an opening in family court and we would expect Stitt to recommend the transfer, but he didn't, and maybe that was because of discrimination. So what is your response to that? Well, Director Neubauer testified that there was an opening. And Magistrate Lindsey said that, noted in her decision, that Maddow made a collusory assertion without any support in the record that that was the case, that there was an opening. Okay, so you're saying that the district court found that there was not an opening and it wasn't clearly erroneous. Correct. Well, no, that's not going to be good enough for you, right? Because this is a summary judgment decision. It's not a fact finding that's either clearly erroneous or not. It's a question of you're saying there was nothing in the record that would support this statement that there really was an opening. And Mr. Bergstein says that there's something in Stitt's testimony or deposition that suggests that there was an opening. So that's just something we can check and determine whether it's the case. Right. I mean, or we could go with the testimony of Director Neubauer that there was not an open position. She wasn't. There was no evidence that she had any discriminatory animus towards Mr. Beddow. Are you saying there were never any openings or were there openings after the investigation began about his conduct that ultimately led to his firing? In other words, you're not saying there were no positions at all, but at that point he was already his job was on the line.  At the time of the transfer requests, there were no openings. The investigation had ongoing several months before the charges were actually filed. And that investigation was apparently spurred by Mr. Larson speaking to a judge who made a comment that she had not seen Mr. Beddow in court recently, and that spurred the question, what's he doing? What's going on with these cases? He's not following through the cases. And then Mr. Larson checked records, including GPS records, as well as his written, Beddow's written records indicating that he had made home visits to probationers, and the GPS records didn't match up with him being in his probationer's homes at the time and date indicated on his records. So I'd say, submit that the county had a reasonable non-discriminatory basis to actually bring the charges. Do you think that the evidence about the way the supervisor said congratulations allows the inference of discrimination in the first place? I don't know. A spurt is not, I don't see how that establishes discrimination as a matter of law. And, I mean, it's not in the record, but Mr. Larson was aware of Mr. Beddow's sexual orientation years before. So it wasn't because he told everybody at the department that he got married. Larson was well aware. So it wasn't spurred on by him. I don't know why he spurred. Is the reason why it doesn't allow the inference because of that background or because it's not possible to say congratulations in a kind of sarcastic way that implies disapproval? But how does that, I don't see how that raises the level of discrimination. Mr. Larson didn't have anything to do with the bringing of the charges. Those were brought by Director Neubauer, not Larson. But you said, as you said a moment ago, Larson is the one who initiated the investigation in the first place. At the request of Director Neubauer. It was Neubauer who had the conversation with the judge? No. No, it was Larson. I'm sure Larson had a conversation with the judge. Larson went back to Neubauer and said, this is what I heard from the judge, and I'm sure Neubauer asked that he, you know, check the records of Beddow's doings. His records, anything verified or not verified, check the GPS records. When you say you're sure that Neubauer said that, is that an inference that you are drawing from what you think would be our normal practice, or is there something in your library? That's based on conversations I had with my clients. Okay, but is there anything in the records that we can go on that, you know, that it wasn't Larson who started this whole thing, but it was actually Neubauer who, upon hearing about the conversation with the judge, directed that there be an investigation? Yes. Okay. Yes, there's something in the record, or no, there's not something in the record. Listen, I've been with this case for seven years. It's my belief, but it might be just from conversations, you know, and speaking with my clients, I don't know if it's actually in the record. Okay, I guess we could check. What about the comparators? So I get that, you know, we can rely on findings of an arbitrator that somebody did the conduct, but if it's true that the employer otherwise tolerates the same conduct in people outside the class, wouldn't that still allow the inference of discrimination? But those conducts was not similar to any other comparators. Nobody, he did not endanger the lives of Suffolk County residents by not going to probationers' homes and monitoring these sex offenders. Nobody else did that. He did it. And he wants to blame everything because of his sexual orientation or his national origin. But the facts are facts. It's verified on the record. He admitted to falsifying records at the arbitration. That's in the record. And the arbitration hearing transcripts, they're in the record too. So Mr. Ferguson said that there was a culture of just, you know, taking off time and not having accurate records. What's your response to that? I know that there were certainly there was some poor behavior by other probation officers. I'm not disputing that. But it just, none of those other probation officers' conduct rose anywhere near to Beddow's conduct in this matter. Okay. Thank you very much. Mr. Shermer, we'll turn back to Mr. Bernstein for a rebuttal. Okay. Okay. My only rebuttal point is that Stitt testified that there was a family court opening in June of 2018, which is the same month that plaintiff sought the transfer, and the citation in the record is 263, deposition page 116. There's a colloquy on this point that makes it clear there was a position available at family court at the time that plaintiff sought the family court transfer. Beyond that, I would rest on the briefs. Okay. Thank you very much, Mr. Bernstein. The case is submitted.